**Danielle DOWDY, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 01CV0114(ADS).**

United States District Court, E.D. New York.

July 29, 2002.

Danielle Dowdy, Bellport, NY, Pro se.

Alan Vinegrad, United States Attorney, Islip, NY, by Assistant United States Attorney Mary Elizabeth Delli–Pizzi.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The *Pro Se* plaintiff Danielle Dowdy ("Dowdy" or the "plaintiff") commenced

this action pursuant to the Social Security Act, 42 U.S.C. § 405(g) (the "Act"), seeking review of a final administrative determination of the defendant the Commissioner of the Social Security Administration (the "defendant" or the "Commissioner") denying her application for Social Security Disability Insurance Benefits. In particular, the plaintiff challenges the Commissioner's finding that she was not "disabled" under the provisions of the Act. Presently before the Court is a motion by the Commissioner for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

### A. The Procedural History

On July 17, 1998, the plaintiff filed an application for disability insurance benefits with the Department of Health and Human Services of the Social Security Administration (the "DHHS"). In her application, the plaintiff claimed that she suffered from back pain which has rendered her unable to work as of June 25, 1998. On August 24, 1998, the DHHS denied her application. Shortly thereafter, the plaintiff sought reconsideration of this decision. On October 17, 1998, the DHHS denied her application for reconsideration. Thereafter, the plaintiff requested a hearing on her claim for benefits.

On March 19, 1999, Administrative Law Judge Jerry L. Bassett (the "ALJ") held a hearing on the plaintiff's claim for disability insurance benefits. The plaintiff and her attorney participated in the hearing. On April 7, 1999, the ALJ concluded that the plaintiff was not entitled to disability insurance benefits because she was capable of performing sedentary work within twelve months of her alleged back injury. *In the Case of Danielle Y. Dowdy*, Administrative Hearing at 8 (Apr. 7, 1999). On November 23, 2000, the Appeals Counsel of the Social Security Administration (the

"Appeals Council") denied the plaintiff's request for review of the ALJ's decision.

### B. The Plaintiff's Testimony at the Hearing

At the hearing of March 19, 1999, the plaintiff, then 21 years of age, stated that she was born on July 5, 1977 and completed her high school education. From June of 1995 to October of 1995, the plaintiff worked as a nurse's aid at the Brookhaven Health Care Center. From November of 1995 to January of 1996, the plaintiff worked as a nurse's aid at the Extended Care Home Care Agency. From January of 1996 to November 5, 1998, the plaintiff worked as a nurse's aid at the Woodhaven Nursing Home. As a nurse's aid, the plaintiff's duties consisted of helping patients dress, feed and get in and out of bed.

On April 6, 1998, the plaintiff allegedly injured her back as she was turning and positioning a patient at the Woodhaven Nursing Home. Thereafter, the plaintiff received treatment for her back and returned to work on May 22, 1998. On June 25, 1998, the plaintiff re-injured her back while assisting a patient get out of bed at the Woodhaven Nursing Home. Thereafter, the plaintiff received physical therapy for her back. The plaintiff attended physical therapy until the beginning of March of 1999 when the workers' compensation board refused to authorize any further physical therapy treatment.

The plaintiff testified that her treating physician was Dr. Paul Pipia, a physiatrist. From April 21, 1998 to the date of the hearing, Dr. Pipia examined the plaintiff approximately once a month for her back injury. During that time period, Dr. Pipia referred the plaintiff to various doctors who specialize in, among other things, neurology and spinal cord injuries.

The plaintiff stated that since she injured her back the second time, she suf-

fered from lower back pain which radiated through her legs and into her feet. The plaintiff noted that she was able continuously to stand about thirty to forty minutes and sit about thirty minutes. The plaintiff stated that during the day she placed ice on her back and laid down with pillows positioned around her back. The plaintiff slept about four hours during the night before she got up because of the pain. The plaintiff had difficulty using her arms, hands and lifting objects. For her pain, the plaintiff took Motrin.

The plaintiff stated that she was able to pick up dishes and other small objects. In addition, the plaintiff was able to cook and wash dishes at home. Also, the plaintiff was able to drive a car. Furthermore, the plaintiff stated that she was able to dress herself and her young son. Finally, the plaintiff noted that her fiancee assisted her with the housecleaning such as mopping, sweeping and vacuuming the floors in her home.

On March 5, 1999, the workers' compensation board notified the plaintiff that she had been referred to its rehabilitation bureau for vocational services which involved job placement and retraining. The rehabilitation bureau recommended computer programming because a job in this field would allow her the flexibility to sit, stand and walk during the day. However, the plaintiff noted that if she was able to find a job to accommodate her needs and she was permitted to attend physical therapy, she expressed a preference for a part-time position.

## C. The Medical Evidence

### 1. Dr. Bradley Spangher

On April 6, 1998, after the plaintiff allegedly injured her back, she went to the emergency room of Mather Memorial Hospital in Port Jefferson, New York. There, Dr. Bradley Spangher, the emergency room physician, treated the plaintiff. Dr. Spangher reported that the plaintiff had tenderness at L4–5 slightly to the left, deep tendon reflexes were +1 bilaterally and extension hallucis longus muscle strength and sensation were intact. Dr. Spangher diagnosed the plaintiff with a lumbosacral sprain. Dr. Spangher prescribed Demoral and Vistaril. Dr. Spangher noted that the plaintiff should be able to return to work on April 9, 1998. Also, Dr. Spangher instructed the plaintiff not to do any heavy lifting for one week.

### 2. Dr. David A. Kessler

On April 13, 1998, Dr. David A. Kessler examined the plaintiff in connection with her application for workers' compensation benefits. Dr. Kessler diagnosed the plaintiff with lumbago and spasm of muscle. Dr. Kessler reported that the plaintiff was "totally disabled" and unable to work. On April 20, 1998, Dr. Kessler re-examined the plaintiff and reported that the plaintiff's condition remained the same.

On June 25, 1998, after the plaintiff re-injured her back, she returned to Dr. Kessler. Dr. Kessler diagnosed the plaintiff with a lumbosacral sprain.

### 3. Dr. Paul Pipia

On April 21, 1998, Dr. Paul Pipia, the plaintiff's treating physiatrist, examined the plaintiff in connection with the plaintiff's application for workers' compensation benefits. Dr. Pipia diagnosed the plaintiff with a lumbosacral sprain and reported that the plaintiff was "totally disabled" and unable to work. For her treatment, Dr. Pipia recommended physical therapy and medication.

On May 5, 1998, Dr. Pipia re-examined the plaintiff and reported that her condition remained the same. Dr. Pipia reported that the plaintiff was able to toe and heal walk without difficulty. Dr. Pipia instructed the plaintiff to continue with her

physical therapy and remain out of work until her next examination in two weeks.

On May 19, 1998, Dr. Pipia re-examined the plaintiff. Dr. Pipia reported that the plaintiff was able to perform forward flexion at the hips to 90 degrees but very slow, extension with minimal discomfort, lateral flexion at the hips were full. Also, the plaintiff was able to toe, heel and squat within normal limits. Dr. Pipia noted that the remainder of his examination was normal. Finally, Dr. Pipia stated that the plaintiff should complete physical therapy that week and return to work on May 22, 1998.

On July 1, 1998, Dr. Pipia examined the plaintiff after she re-injured her back. Dr. Pipia diagnosed the plaintiff with acute lower back strain. Dr. Pipia prescribed a Medrol dose pack. A physical examination revealed that the plaintiff had full range of motion in her neck. Her reflexes were intact in both upper extremities. There was a positive straight leg raising in the seated and supine positions at 70 degrees. Heel, toe and tandem gait walking were normal. Flexion at the hips was positive to pain at 50 degrees with increased pain when she returned to a standing position.

On August 4, 1998, Dr. Pipia re-examined the plaintiff. Dr. Pipia diagnosed lumbago. Dr. Pipia reported that the plaintiff was "totally disabled" and unable to work. Also, Dr. Pipia recommended that the plaintiff undergo an MRI of her lumbosacral spine and referred her to Dr. Steven Ender for a neurological examination.

On September 1, 1998, Dr. Pipia re-examined the plaintiff. Dr. Pipia diagnosed lumbosacral sprain. Dr. Pipa reported that the plaintiff was "totally disabled" and unable to work. Dr. Pipia recommended that the plaintiff continue her physical therapy.

On November 4, 1998, Dr. Pipia re-examined the plaintiff. The Physical examination revealed that the plaintiff had pain with forward flexion at the hips. The plaintiff was unable to bend past 30 degrees without pain. Reflexes were +1 in both lower extremities. Dr. Pipia recommended that the plaintiff continue with physical therapy.

On January 12, 1999, Dr. Pipia re-examined the plaintiff. Dr. Pipia diagnosed the plaintiff with lumbago. Dr. Pipia reported that the plaintiff was "partially disabled" but was able to return to work and perform light duties.

### 4. Dr. Raslid Ayyub

On August 11, 1998, Dr. Raslid Ayyub, the examining physician for the Commissioner, evaluated the plaintiff. Dr. Ayyub diagnosed lumbar radiculopathy and bilateral sciatica. Dr. Ayyub opined that the plaintiff was able to sit for two to three hours with frequent intervals, stand from forty-five to ninety minutes with frequent rests, walk for five to ten blocks with frequent rests and carry up to fifteen pounds.

### 5. Dr. Steven Ender

On August 13, 1998, Dr. Steven Ender, the neurologist to whom Dr. Pipia referred her, examined the plaintiff. Dr. Ender's impression was chronic lower back pain, status post lumbosacral strain and ruled out herniated disc or spinal stenosis. Dr. Ender recommended that the plaintiff continue with her physical therapy and Flexeril. In connection with the plaintiff's application for workers' compensation benefits, Dr. Ender reported that the plaintiff was "totally disabled" and unable to work.

### 6. Dr. Frank Guellich

On August 22, 1998, Dr. Frank Guellich, an examining orthopedist for the workers' compensation board, evaluated the plain-

tiff. Dr. Guellich diagnosed the plaintiff with lumbosacral strain versus HNP L4–5 unresolved. Dr. Guellich reported that the plaintiff had a "moderate partial disability." Examination of the lumbosacral spine revealed that the plaintiff was able to flex and extend to 40 degrees with pain. The plaintiff had tenderness in the mid lumbar spine. The plaintiff was able to walk on her tiptoes and heels satisfactorily.

### 7. Dr. L. Camardi

On August 25, 1998, Dr. L. Camardi, a physician for the New York State Department of Social Services, Office of Disability Determinations, reviewed the plaintiff's medical records and prepared a physical residual functional capacity assessment. Dr. Camardi reported that the plaintiff was able to lift twenty pounds occasionally, stand about six hours in an eight hour workday and sit about six hours in an eight hour workday. The plaintiff had no limitations on her ability to push or pull. Dr. Camardi noted that Dr. Ayyub's conclusions were not supported by his objective findings which indicated that the plaintiff was able to get up and off the examination table without assistance.

### 8. Dr. Laurence E. Mermelstein

On November 16, 1998, Dr. Laurence E. Mermelstein of the Long Island Spine Specialists examined the plaintiff. Dr. Mermelstein diagnosed lumbar degenerative disc disease, discogenic back pain syndrome, tethered spinal cord and intra-canal lipoma. Dr. Mermelstein reported that physical therapy had worked well in the past. Low back examination revealed restricted motion of both flexion and extension. Lateral bending was not overly painful but the plaintiff was restricted to about 60 percent of the expected range.

On December 24, 1998, Dr. Mermelstein re-examined the plaintiff. Dr. Mermelstein diagnosed lumbar degenerative disc disease and discogenic back pain syn-

drome. Dr. Mermelstein recommended that the plaintiff continue with her physical therapy and prescribed Motrin for her symptoms.

### 9. The Post–Hearing Medical Evidence

After the decision of the ALJ, the plaintiff submitted additional medical evidence to the Appeals Council which was considered on appeal.

#### a. Dr. Paul Pipia

On March 3, 1999, Dr. Pipia re-examined the plaintiff in connection with her application for workers' compensation benefits. Dr. Pipia diagnosed lumbago. Dr. Pipia reported that the plaintiff was "partially disabled" and was able to return to work and perform light duties. On March 31, 1999, Dr. Pipia re-examined the plaintiff. Dr. Pipia reported that the plaintiff advised him that physical therapy helped her remain in a workable position. Dr. Pipia noted that the plaintiff continues to suffer from back pain with extension, forward flexion and rotation. Reflexes were intact and strength was within normal limits.

On May 4, 1999, Dr. Pipia re-examined the plaintiff. Dr. Pipia reported that the plaintiff suffered pain with palpation of the lumbar spine from L2–L5. Dr. Pipia recommended that the workers' compensation board permit the plaintiff to have facet blocks in connection with her physical therapy.

#### b. Dr. Laurance E. Mermelstein

On April 20, 1999, Dr. Mermelstein re-examined the plaintiff. Dr. Mermelstein reported that the plaintiff should keep as active as possible. Dr. Mermelstein noted that the plaintiff remained "totally disabled" from work and she had a "moderate degree of disability."

On June 2, 1999, Dr. Mermelstein re-examined the plaintiff. Dr. Mermelstein reported that the plaintiff's back continued to be tender in the paraspinal region. Reflexes were intact and symmetric at the knees and ankles. Dr. Mermelstein noted that the plaintiff had a "permanent partial disability of a moderate severity." He recommended that the plaintiff continue with her physical therapy for intermittent treatment. On October 19, 1999, Dr. Mermelstein re-examined the plaintiff. Dr. Mermelstein reported that the plaintiff had limited flexion to 20 degrees in the lumbar spine. Her extension was slightly better at 35 degrees. The plaintiff was able to heel to toe walk without difficulty. Reflexes were intact and symmetric.

### c. Dr. Timothy D. Groh

On October 27, 1999, Dr. Timothy D. Groh of the Long Island Spine Specialists examined the plaintiff. Dr. Groh noted that the plaintiff's MRI revealed herniated disc at L4–5 and L5–S1. Dr. Groh prescribed Ibuprofen and Levbid.

### d. Dr. Kevin J. Mullins

On April 24, 2000, Dr. Kevin J. Mullins, an examining neurosurgeon, evaluated the plaintiff. Dr. Mullins reported that a component of the plaintiff's back pain appeared to be myofascial and secondary to muscular pain. Dr. Mullins recommended that the plaintiff undergo a follow-up MRI of her lumbar spine.

On June 16, 2000, Dr. Mullins re-examined the plaintiff. Dr. Mullins reported that the plaintiff complained of lower back discomfort coupled with some pain radiating down her left leg. Review of the plaintiff's MRI revealed a tethered cord that extended down to the L4–5 junction and was associated with an intradural lipoma. Dr. Mullins noted that he was uncertain if surgery would provide her with any significant relief to the lower back. Finally, Dr. Mullins stated that he encouraged her to obtain a second opinion and to see him within eight weeks for a routine follow-up visit.

### 10. The Disability Determination and Transmittal

On August 24, 1998, the DHHS issued a Disability Determination and Transmittal as to the plaintiff's claim for disability insurance benefits. The DHHS found that the plaintiff was "not disabled" and thus not entitled to disability benefits under the Act.

### D. The ALJ's Findings

As stated above, on March 19, 1999, the ALJ held a hearing in connection with the plaintiff's claim for disability insurance benefits. On April 7, 1999, the ALJ concluded based upon the evidence at the hearing that the plaintiff was not entitled to disability insurance benefits because she was capable of performing sedentary work within twelve months of her alleged back injury. *In the Case of Danielle Y. Dowdy,* Administrative Hearing at 8 (Apr. 7, 1999). In his decision, the ALJ made the following findings:

1. The claimant, who was born on July 5, 1977, met the special earnings requirements of Title II of the Act on April 6, 1998, the amended date she alleges she became unable to work, and continues to meet them through June 30, 1999.

2. With the exception of an unsuccessful work attempt from May 22, 1998 to June 25, 1998, the claimant has not engaged in substantial gainful activity since April 6, 1998.

3. The medical evidence establishes that the claimant is severely impaired by degenerative and discogenic disease of the lumbosacral spine with radiculopathy, but that she does not have an impairment, or combination of impair-

ments, which meets or equals in severity and duration any impairment in the Listing of Impairments, Appendix 1, Subpart P, Part 404 of the Regulations.

4. The claimant's testimony concerning her limitations and the severity of her symptoms is not entirely credible. By January 12, 1999, the claimant no longer had pain, numbness, tingling, or other symptomatology of such severity, frequency and duration as to cause "disability."

5. By January 12, 1999 the claimant had regained the residual functional capacity to perform at least sedentary work.

6. The claimant lacks the residual functional capacity to perform her past relevant heavy, semiskilled work as a nurse's aid.

7. The claimant is 21 years old, a younger individual, and has a high school education.

8. The claimant does not have transferable skills to skilled or semiskilled sedentary work.

9. Analysis of the claimant's residual functional capacity and vocational factors within the Medical–Vocational Guidelines of Rule 201.28, Table No. 1, Appendix 2, Subpart P, Part 404 of the Regulations, reveals that a decision of "not disabled" is directed.

10. By January 12, 1999, *i.e.,* less than twelve months after her alleged onset date of April 6, 1998, the claimant regained the ability to perform unskilled sedentary jobs existing in significant numbers in the national economy.

11. The claimant, who was not incapable of engaging in any substantial gainful activity for a continuous period for at least twelve months, is not under a "disability" as defined in Title II of the Act.

*Id.* at 7–8.

On November 23, 2000, the Appeals Counsel denied the plaintiff's request for review of the ALJ's decision of April 7, 1999. On January 9, 2001, the plaintiff filed a complaint with this Court against the Commissioner alleging that she was entitled to disability insurance benefits arising out of her disability, namely a degenerative disc disease in her lower back. Presently before the Court is a motion by the Commissioner for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. The plaintiff has not submitted any opposition papers to this motion.

## II. DISCUSSION

### A. The Legal Standard

 This Court reviews the Commissioner's decision to determine whether: (1) the Commissioner applied the correct legal standard, *see Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999); and (2) the decision is supported by substantial evidence, *see* 42 U.S.C. § 405(g); *Brown v. Apfel,* 174 F.3d 59, 61–62 (2d Cir.1999). Substantial evidence is "more than a mere scintilla." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). It means " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Brown,* 174 F.3d at 62–63. "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* at 62 (quoting *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir. 1983) *(per curiam )).* The Court also must "keep[ ] in mind that it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Commissioner of Social Security,* 143 F.3d 115, 118 (2d Cir.1998). Indeed, in evaluating

the evidence, "the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon de novo review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir.1991) (quoting *Valente v. Secretary of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984)).

## B. The Availability of Benefits

Federal disability insurance benefits are available to those individuals who are "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). To be eligible for disability benefits under the Act, the plaintiff must establish her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

■ The Commissioner has promulgated a five-step analysis for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has explained:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the Regulations. If the claimant has such

an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir.1998) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)); *see also Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir.1998); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir.1998). The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof as to the fifth step. *See Schaal*, 134 F.3d at 501 (citing *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir.1996); 20 C.F.R. §§ 404.1520, 416.920).

To meet his burden of proof on the fifth step, the Commissioner may rely on the medical vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the grids." The grids take into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the grids indicate whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the grids is dispositive on the issue of disability. However, the grids are not dispositive where they do not accurately represent a claimant's limitations that significantly diminish her capacity to work. *Rodriguez v. Apfel*,

1998 WL 150981 (S.D.N.Y.1998) (citations omitted). There are five levels of exertion which are derived from the grids: sedentary, light, medium, heavy, and very heavy. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 200.00–204.00. These criteria are used to determine what level of exertion a claimant is capable of performing in an occupational setting.

Proceeding through the five-step analysis, the Commissioner must consider the complete record, including any objective medical evidence, as well as the claimant's subjective statements concerning her or his impairments, restrictions, daily activities and any other relevant statements. *See Bluvband v. Heckler,* 730 F.2d 886, 891 (2d Cir.1984). However, and significantly, the Commissioner must accord special evidentiary weight to the opinion of the treating physician. *See Clark v. Commissioner of Soc. Sec.,* 143 F.3d 115, 119 (2d Cir. 1998). The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by the medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir.2000); *see Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999); *Clark,* 143 F.3d at 119; *Schisler v. Sullivan,* 3 F.3d 563, 567 (2d Cir.1993). The rule, as set forth in the regulations, provides:

> Generally, we give more weight to opinions by your treating sources.... If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). In analyzing a treating physician's report, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." *Rosa,* 168 F.3d at 79; *see Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir.1998). If the opinion of the treating physician as to the nature and severity of the impairment is not given controlling weight, the Commissioner applies various factors to decide how much weight to give the opinion. *See Shaw,* 221 F.3d at 134; *Clark,* 143 F.3d at 118. Those factors include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Clark,* 143 F.3d at 118. When the Commissioner chooses not to give the treating physician's opinion controlling weight, she or he must "give good reasons in [its] notice of determination or decision for the weight [it] gives [claimant's] treating source's opinion." *Clark,* 143 F.3d at 118 (quoting C.F.R. §§ 404.1527(d)(2); 416.927(d)(2)).

## C. The ALJ Adhered to the Sequential Evaluation

In this case, the ALJ adhered to the regulatory five-step sequential evaluation. First, the ALJ found that the plaintiff met the special insured status requirements of the Act from April 6, 1998 until June 30, 1999 and that the plaintiff engaged in no substantial gainful activity since April 6, 1998, except for her unsuccessful attempts to return to work between May 22, 1998 to June 25, 1998. Second, the ALJ found that the medical evidence established that the plaintiff was severely impaired by degenerative and discogenic disease of the lumbosacral spine with radiculopathy.

Third, the ALJ found that the plaintiff's impairment did not met or equal in severity the clinical criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P,

App. 1. Fourth, the ALJ evaluated the plaintiff's residual functional capacity and found that she lacked the ability to perform her past relevant heavy, semiskilled work as a nurse's aid. Fifth, the ALJ found that by January 12, 1999, the plaintiff was capable of performing at least sedentary work. Based upon the plaintiff's young age, education level and ability to perform sedentary work, she was capable of performing a significant number of unskilled sedentary jobs which existed in the national economy. Accordingly, the ALJ applied the correct legal standard.

### D. The ALJ's Finding is Supported by Substantial Evidence

■ The medical evidence and the opinions in the records offer substantial support for the ALJ's residual functional capacity finding that by January 12, 1999, the plaintiff was capable of performing at least sedentary work. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). Also, sedentary work generally involves up to two hours of standing or walking and up to six hours of sitting in an eight-hour workday. Social Security Ruling 83–10. *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996). The ALJ is solely responsible for deciding a plaintiff's residual functional capacity. 20 C.F.R. § 404.1546.

On January 12, 1999, Dr. Pipia, the plaintiff's treating physiatrist, reported that the plaintiff was "partially disabled" but was able to return to work and perform light duties. On March 3, 1999, Dr. Pipia re-examined the plaintiff and reported that she remained "partially disabled" but was able to return to work and perform light duties. Dr. Pipia's opinion is the most reliable of all the doctors because he is most familiar with the plaintiff's condition having treated her approximately once a month since her alleged injury on April 6, 1998.

By finding that the plaintiff was capable of sedentary work by January 12, 1999, the ALJ gave Dr. Pipia's opinion "controlling weight" on the issue of whether she was able to perform sedentary work. *See In the Case of Danielle Y. Dowdy,* Administrative Hearing at 5–6 (Apr. 7, 1999). As such, the treating physician rule was observed and the ALJ gave proper weigh to Dr. Mortati's findings. *See Clark v. Commissioner of Soc. Sec.,* 143 F.3d 115, 119 (2d Cir.1998) (stating that the Commissioner must accord special evidentiary weight to the opinion of the treating physician).

Dr. Pipia's opinion alone provides substantial support for the ALJ's residual functional capacity finding. However, other medical records and opinions provide further support for the ALJ's finding. For example, Dr. Camardi, the physician for the State Agency, reported in a physical residual functional capacity assessment dated August 25, 1998 that the plaintiff was able to lift twenty pounds occasionally, stand about six hours in an eight hour workday and sit about six hours in an eight hour workday. This assessment falls well within the definition of sedentary work. Also, Dr. Mermelstein of the Long Island Spine Specialists reported on April 20, 1999 that the plaintiff had a "moderate degree of disability."

Also, the opinions of Dr. Kessler dated April 13, 1998 and Dr. Ender dated August 13, 1998 which reported that the plaintiff was "totally disabled" are not inconsistent with Dr. Pipia's opinion in that Dr. Pipia stated in April and August of 1998 that the plaintiff was "totally disabled." It wasn't until January 12, 1999 that Dr. Pipia opined that the plaintiff was "partially disabled" but was able to return to work and perform light duties. Neither Dr. Kessler nor Dr. Ender examined the plaintiff after

Dr. Pipia gave his opinion that the plaintiff was able to return to work.

Based upon the foregoing, the Court finds that the medical evidence and the opinions in the records offer substantial support for the ALJ's residual functional capacity finding that by January 12, 1999, the plaintiff was capable of performing at least sedentary work.

Because the plaintiff was able to perform sedentary work by January 12, 1999, she cannot establish that she was unable to engage in substantial gainful activity by reason of her back injury for a period of twelve months or more. As such, she is not entitled to disability benefits. *See* 42 U.S.C. § 423(d)(1)(A) (stating that to be eligible for disability benefits the plaintiff must establish her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months."). Accordingly, the motion to dismiss the complaint is granted.

### III. CONCLUSION

Based upon the foregoing, it is hereby

**ORDERED**, that the Commissioner's motion for judgment on the pleadings pursuant to Rule 12(c) is **GRANTED**; and it is further

**ORDERED**, that the complaint is dismissed; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.

**SO ORDERED.**